UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>BIRD GLOBAL, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11 (Post-Confirmation)<br><br>Case No. 23-20514-CLC<br><br>(Jointly Administered) |
| JOSEPH J. LUZINSKI, as Liquidating Trustee of the Bird Global Liquidating Trust,<br><br>Plaintiff,<br><br>v.<br><br>ERNST & YOUNG LLP and ERNST & YOUNG US LLP,<br><br>Defendants. | Adv. Proc. No. 26-01171-CLC |

**AMENDED[2] ADVERSARY COMPLAINT TO AVOID AND RECOVER CONSTRUCTIVE FRAUDULENT TRANSFERS**

JOSEPH J. LUZINSKI ("**Trustee**" or the "**Plaintiff**"), as Liquidating Trustee of the Bird Global Liquidating Trust, by counsel, files this Complaint against ERNST & YOUNG LLP ("**EY**") and ERNST & YOUNG US LLP ("**EY US**," and together with EY, the "**Defendants**"), to avoid and recover transfers to and for the benefit of the Defendants pursuant to sections 544, 548, and 550 of title 11 of the United States Code ("**Bankruptcy Code**"), Rule 7001 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rule(s)**"), Chapter 726 of the Florida Statutes (or, in the alternative, New York Debtor and Creditor Law §§ 273(a)(2) and 274(a)), and alleges as follows:

[1] At all relevant times, the Debtors' principal place of business was located at 392 Northeast 191st Street, #20388, Miami, FL 33179.

[2] This Amended Complaint has been filed as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1)(B) (as incorporated into Fed. R. Bankr. P. 7015).

## A. PROCEDURAL BACKGROUND

1. On December 20, 2023 (the "**Petition Date**"), voluntary petitions for relief under chapter 11 of title 11 of the United States Code were filed by Bird Global Inc., Bird Rides Inc., Bird US Holdco LLC, Bird US Opco LLC, and Skinny Labs Inc. (together, "**Bird**," "**Company**," or the "**Debtors**") with the United States Bankruptcy Court for the Southern District of Florida.

2. On the same day, the Court entered an *Order Granting Debtors' Ex Parte Motion for Joint Administration* of the Debtors' cases for procedural purposes only. See Case No. 23-20514-CLC, ECF No. 29.[3]

3. On June 3, 2024, the Debtors filed their *Second Amended Joint Chapter 11 Plan of Liquidation* (ECF No. 802 – the "**Chapter 11 Plan**").

4. Among other things, Article VI of the Chapter 11 Plan provided for (i) the establishment of a Liquidating Trust; (ii) the appointment of Joseph J. Luzinski as Liquidating Trustee; (iii) the preservation of "Retained Causes of Action" (as defined therein); and (iv) the Liquidating Trustee's standing to prosecute Retained Causes of Action. Exhibit 6 of the Chapter 11 Plan likewise provided that "[o]n and after the Effective Date … the Liquidating Trustee … shall have standing to and may pursue such Retained Causes of Action" specifically including, but not limited to, "claims to avoid and recover constructive or actual fraudulent conveyances under 11 U.S.C. §§ 544, 548, 550 and Fla. Stat. Ann. § 726.101-201…."

5. On August 2, 2024, the Court entered an *Amended Order (I) Approving the First Amended Disclosure Statement for Debtors' Second Amended Joint Chapter 11 Plan of Liquidation on a Final Basis, (II) Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation, (III) Approving the Insurance Settlement Agreements, and (IV) Entering Bar Order*

[3] Citations to electronic case filings shall be to those appearing on the docket in lead case number 23-20514-CLC.

*and Channeling Injunction* (ECF No. 1214 - the "**Confirmation Order**").

6. In the Confirmation Order, the Court approved the Liquidating Trust Agreement, ratified the selection of Joseph J. Luzinski as Liquidating Trustee, and stated that the Liquidating Trustee shall have standing to and may pursue Retained Causes of Action after the Effective Date. *See* Confirmation Order, Conclusion of Law at ¶¶ 9 and 32.

7. On September 17, 2024, the Debtors filed their *Notice of Occurrence of Effective Date of the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation* (ECF No. 1334) and stated therein that the effective date of the Chapter 11 Plan occurred on September 17, 2024 (the "**Effective Date**").

**B. PARTIES**

8. Plaintiff is the Liquidating Trustee and fiduciary responsible for administering the Liquidating Trust for the benefit of the Debtors' creditors. Plaintiff is the representative of the Debtors' estates with exclusive standing and authority to enforce, sue on, prosecute, settle, or compromise "Retained Causes of Action" assigned and transferred to the Liquidating Trust including "claims to avoid and recover constructive or actual fraudulent conveyances under 11 U.S.C. §§ 544, 548, 550 and Fla. Stat. Ann. § 726.101-201" pursuant to the Confirmation Order.

9. EY is a Delaware limited liability partnership with a principal place of business located in New York, New York. EY is one of the "Big Four" accounting firms. On its website, EY touts: "[O]ur purpose is [b]uilding a better working world. The insights and quality services we provide help build trust and confidence in the capital markets and in economies the world over. We develop outstanding leaders who team to deliver on our promises to all our stakeholders. In

so doing, we play a critical role in building a better working world for our people, for our clients and for our communities."[4]

10. EY US is a Delaware limited liability partnership with a principal place of business located in New York, New York.

## C. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b). In the Confirmation Order, the Court retained exclusive jurisdiction over any matter arising under the Bankruptcy Code and arising in or related to the Debtors' Chapter 11 Cases or the Chapter 11 Plan, to the fullest extent as is legally permissible. This action holds a close nexus to the Chapter 11 Plan, in that it affects the interpretation, consummation, execution, or administration thereof.

12. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (H), and (O). Plaintiff consents to the entry of final orders and judgment by the Bankruptcy Court.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## D. GENERAL ALLEGATIONS

### I. Bird's knowledge of each customer's pre-loaded virtual wallet balance was critically important to accurate financial reporting in accordance with GAAP and to ensure the financial statements it published to the general public were free from material misstatements.

14. Bird was a micromobility company that provided the general public with access to a fleet of electric vehicles (such as e-scooters and e-bikes) for short-distance transportation ("**Sharing**," "**Shared Vehicles**," or "**Sharing Business**").

[4] See https://www.ey.com/en_us/about-us (last visited April 29, 2026).

15. In order for a customer to begin a ride on a Shared Vehicle in the United States, he first had to deposit funds into a personal virtual wallet maintained on the Bird smartphone application ("**Customer Wallet(s)**" or "**Customer Wallet Balance(s)**").

16. Upon completion of the ride, Bird would deduct funds equivalent to the cost of the ride from the Customer Wallet.

17. If the cost of the ride was equivalent to the Customer Wallet Balance, the balance would be depleted and the customer would have to deposit additional funds into his Customer Wallet in order to take future rides.

18. In instances where the cost of a ride was less than the Customer Wallet Balance, the customer could apply the remaining balance to future ride(s) or request a full refund prior to September 30, 2022 (the "**Positive Wallet Balance(s)**").

19. However, when the cost of a ride exceeded the Customer Wallet Balance, Bird would attempt to collect the "overdraft" immediately upon completion of the ride by charging the customer's payment method on file. In the event this so-called "auto-pay-refill transaction" was unsuccessful, the overdraft in the Customer Wallet would persist (the "**Negative Wallet Balance(s)**").

20. Importantly, Bird was required to prepare and present its financial statements in accordance with generally accepted accounting principles ("**GAAP**").[5]

[5] GAAP is a set of accounting principles, standards, and procedures that companies are required to follow when preparing and presenting their financial statements. It provides a standardized framework for financial reporting to ensure consistency, comparability, and transparency in financial statements.

21. At all relevant times, Bird stated that it accounted for Sharing revenue as operating lease revenue pursuant to Accounting Standards Codification[6] ("**ASC**") 840[7], *Leases,* and accounted for revenues from the remaining revenue streams pursuant to ASC 606, *Revenue from Contracts with Customers* (together, the "**ASCs**").

22. Under the foregoing accounting standards, Bird was required to record amounts charged to and collected from Customer Wallets as revenue.

23. Bird was also generally required to record Negative Wallet Balances and Positive Wallet Balances[8] as deferred revenue.

24. Significantly, Bird was prohibited from recording Negative Wallet Balances as revenue pursuant to the foregoing accounting standards unless it had analyzed the likelihood of collecting each customer's negative balance and concluded that collection of such amount was reasonably assured (the "**NWB Collectability Analysis**").

25. Bird was also prohibited from recording Positive Wallet Balances as revenue pursuant to the foregoing accounting standards unless it confirmed each customer's positive balance was non-refundable and concluded the likelihood of each customer applying the funds to Shared Vehicle usage in the future was remote (the "**PWB Breakage Analysis**").

26. In or about 2020, EY knew that a wallet subledger was necessary to ascertain each Customer's Wallet Balance (positive or negative) (the "**Wallet Subledger**") and that such information was essential to accurate financial reporting of Bird's revenue and deferred revenue in accordance with GAAP.

---

[6] The Accounting Standards Codification is the single, authoritative source of generally accepted accounting principles recognized by the Financial Accounting Standards Board.

[7] In its securities filings, Bird stated that it accounted for Sharing revenue pursuant to ASC 840 and was "in the process of evaluating [the] impact" of the superseding codification ASC 842.

[8] Positive Wallet Balances were recorded as deferred revenue because of Bird's liability to fulfill its performance obligation to those customers in the future.

27. As Amy Murphy (Bird's Director of Global Revenue) recognized, the subledger "was ALWAYS to ensure accurate reporting of revenue and tie to cash."[9] (Emphasis in the original).

## II. EY issued unqualified opinions certifying to the general public that Bird's financial statements conformed with GAAP and were free from material misstatements from 2020 through 2Q 2022 but, Bird subsequently admitted the financial statements failed to comply with GAAP and were materially false, misleading, and wholly unreliable.

28. Prior to the Petition Date, Bird engaged EY to (i) audit and report on the Company's consolidated financial statements for the years ended December 31, 2020, December 31, 2021, and December 31, 2022; and (ii) to review the Company's unaudited interim financial information (the "**Engagement**").

29. The Bird-EY Engagement letters[10] also provided in pertinent part as follows:

> The objective of the audit is to express an opinion on whether the consolidated financial statements are presented fairly, in all material respects, ***in conformity with U.S. generally accepted accounting principles***.[11]
>
> We will conduct the audit in accordance with auditing standards generally accepted in the United States, as established by the American Institute of Certified Public Accountants (the "AICPA")[12]. Those standards require that we obtain reasonable, rather than absolute, assurance that the consolidated financial statements are free of material misstatement whether caused by error or fraud.
>
> As part of the audit, we will consider, solely for the purpose of planning the audit and determining the nature, timing and extent of our audit procedures, the Company's internal control over financial reporting.
>
> We also may communicate other opportunities we observe for economies in or improved controls over the Company's operations.

---

[9] Thus, the converse should also have been true: accurate reporting of "revenue and tie to cash" could not be ensured without the Wallet Subledger.

[10] The engagement letters were solely between Bird and EY. EY US was not a party thereto.

[11] Unless indicated otherwise, emphasis is added.

[12] After Bird became a public company in November 2021, the engagement letters stated the audit would be conducted in accordance with the standards of the Public Company Accounting Oversight Board (PCAOB).

> The review of the Company's unaudited interim financial information will be performed in accordance with the applicable standards of the PCAOB.
>
> A review includes obtaining sufficient knowledge of the Company's business and its internal control as it relates to the preparation of both annual and interim financial information to: identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence; and select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to ***conform with U.S. generally accepted accounting principles***.
>
> Management is responsible for providing us access to: all information of which management is aware that is relevant to the Audit Services...; additional information that we may request from management for purposes of the audit; and unrestricted access to persons within the Company from whom we may determine it necessary to obtain audit evidence.
>
> We may terminate performance of the Audit Services and this Agreement upon written notice if we reasonably determine that we can no longer provide the Audit Services in accordance with applicable law or professional obligations.

30. At all times during the course of its engagement, EY knew that (i) Customer Wallet Balances were the primary source of Bird's revenue from the Sharing Business; (ii) the Wallet Subledger would reflect the financial position of each Customer's Wallet Balance; and (iii) the Wallet Subledger was essential to accurate financial reporting of Bird's revenue and deferred revenue in accordance with GAAP.

31. Nevertheless, EY commenced and continued its role as Bird's independent auditor without the Wallet Subledger from 2020 through 2Q 2022.

32. At all relevant times, EY also knew that Negative Wallet Balances could be incurred in Customer Wallets. For instance, on April 21, 2021, an EY representative stated as follows in an email to Bird representatives:

> We were reviewing the ride history for the users selected for testing, and one of the riders activity looked a little funky (see attached user 1). As you'll see, ***the wallet balance is pretty much consistently showing as a negative but I don't think a user is allowed to carry a negative balance are they?*** I also attached another user in tab 2 which has a similar history but makes more sense – I think what's happening is a user only needs to have money in their wallet to start a ride, so say they have $1 and started a ride and took a $5 ride, the liability at the end would show $(4) but then immediately after there is an autofill of $5 or $10, which would cover that ride. Is that correct?

33. In response, a Bird representative stated:

> [U]sers only need to have a small balance to start a ride – so your example of starting with a balance of $1, taking a $5 ride (balance now -$4), and then seeing a $10 reload (balance now $6) is totally correct … If we compare User 1's final "paid wallet balance", we actually see that it matches our internal tooling within Dash – which gives me lots of confidence (paired with having read through their transaction log) that things are happening as they should.

34. Despite its obligations as the Company's independent auditor, EY simply accepted Bird's representation that Negative Wallet Balances would be cured immediately upon completion of the rides in which they were incurred through auto-pay-refill transactions and then parroted the representation nearly verbatim in a *Revenue Testing Workpaper* as of December 31, 2020. Therein, EY stated as follows:

> We noted that negative ending wallet balances per the schedule below are simply the result of a user's ride exceeding their wallet availability, which will then be subsequently auto re-filled prior to additional rides being taken. For example, if a user started a ride with $1 in their wallet, but the length of the ride resulted in a $5 cost to the user, that individual line would appear as a negative wallet balance, however, the subsequent activity would be an inflow, usually auto-pay refill, to cover the negative balance. As such, we deem the activity reasonable; no issues noted.

35. Despite EY's knowledge Negative Wallet Balances could be incurred in Customer Wallets, EY failed to require or conduct a NWB Collectability Analysis as required by the above-referenced ASCs at any time in the period 2020 through 2Q 2022.

36. EY also failed to require or conduct a PWB Breakage Analysis at any time in the period 2020 through 2021.

37. Despite its knowledge that (i) the Wallet Subledger did not exist; (ii) the NWB Collectability Analysis had not been performed; and (iii) the PWB Breakage Analysis had not been performed, EY issued the following unqualified audit opinion concerning the financial statements filed by Bird with the SEC from 2020 through 2Q 2022:

> We have audited the accompanying consolidated balance sheets of Bird Global, Inc. (the "Company") ***as of December 31, 2021 and 2020***, the related consolidated statements of operations, comprehensive loss, … and cash flows for each of the three years in the period ended ***December 31, 2021***, and the related notes (collectively referred to as the "consolidated financial statements"). *In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at* ***December 31, 2021 and 2020****, and the results of its operations and its cash flows for each of the three years in the period ended* ***December 31, 2021 in conformity with U.S. generally accepted accounting principles.***[13]

(Emphasis added).

38. In other words, EY vouched that Bird's financial condition was accurately depicted in the financial statements filed with the SEC from 2020 through 2Q 2022 and knew that lenders, investors, other creditors, and counterparties would rely thereon.

39. However, on November 11, 2022[14], Bird filed an SEC Form 8-K which stated therein under the section heading "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review" (the "**Disclosure**") as follows:

[13] See https://www.sec.gov/ix?doc=/Archives/edgar/data/1861449/000186144922000037/brds-20211231.htm (last visited on April 29, 2026).

[14] See https://www.sec.gov/ix?doc=/Archives/edgar/data/1861449/000186144922000214/brds-20221111.htm (last visited April 29, 2026). Also, on this same date, EY Coordinating Partner Auger messaged his colleague as follows: "Greg [Wright's] call was about as negative as I thought it would be. Said he lost trust in me etc. etc." At the time, Greg Wright was Bird's Controller.

> (i) the Company's audited consolidated financial statements as of ***December 31, 2021 and 2020***, and for the years then ended, and quarterly periods within those years …, (ii) its condensed consolidated financial statements as of ***March 31, 2022***, and for the three months then ended …, and (iii) its condensed consolidated financial statements as of ***June 30, 2022***, and for the three and six months then ended … (collectively, the "***Original Filings***", and each such quarterly or annual period covered therein, an "***impacted period***"), ***should no longer be relied upon***. Similarly, any previously furnished or filed reports, related earnings releases, investor presentations or similar communications of the Company describing the Company's financial results contained in the Original Filings ***should no longer be relied upon***.

40. The Disclosure went on to explain that Bird improperly recognized Negative Wallet Balances as revenue during the impacted periods and, thus, Bird's revenue was materially overstated (and deferred revenue was materially understated) during such time frame.

41. Specifically, Bird's revenue as previously reported on the Form 10-K for the years ended December 31, 2020 and December 31, 2021 was overstated by $4.5 million and $14.5 million, respectively. Additionally, Bird's revenue as previously reported on the Form 10-Q was materially overstated by $2.6 million and $9.9 million for the periods ended March 31, 2022 and June 30, 2022.

42. On November 18, 2022, Bird restated its financials from 2020 through 2Q 2022 in Form 10-K/A, 10-Q/A, and 10-Q filings with the SEC (the "**Restatement**")

43. The consequences of the Restatement were devastating to Bird. It triggered an SEC investigation, led to the resignation of Bird's Chief Executive Officer and Chief Financial Officer, destroyed investor and lender confidence, and accelerated Bird's path to bankruptcy on the Petition Date.

44. Although EY was hired to "express an opinion on whether the consolidated financial statements [were] presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles", EY acknowledged in a memorandum entitled

"NOCLAR Evaluation Related to Revenue Restatement" dated February 19, 2023 that Bird's overstatement of revenue and understatement of deferred revenue from 2020 through 2Q 2022 was "material" and "***due to a misapplication of GAAP***."

**III. EY attempts to save face with Bird by abandoning its role as an independent auditor and actively participating in the Company's breakage revenue scheme through an Alter Ego/Sham Special Purpose Entity.**

45. Due to the accounting adjustments necessitated by the Restatement, Bird's U.S.-based wallet liabilities skyrocketed to approximately $67 million (the "**Wallet Liabilities**").

46. Bird then began to actively look for ways to artificially improve its financial statements by simultaneously making up for the lost revenue and getting the Wallet Liabilities owed to customers off its balance sheet.

47. Bird, (with the advice and assistance of EY), concluded these objectives could be accomplished through the revenue recognition concept of breakage.[15]

48. In other words, Bird wanted to keep customer funds comprising the Positive Wallet Balances for itself and to recognize revenue in an amount that would approximate the $30 million reduction in revenue necessitated by the Restatement.

49. Indeed, in an internal email dated November 10, 2022 (the day prior to the Disclosure), Bird's CFO stated: "While th[e Restatement] will reduce our historical revenues, we are in the process of ***working with our auditors*** to estimate a true-up to breakage, which we expect will be completed in Q4. This true-up will have the effect of increasing our cumulative historical revenues and is expected to roughly approximate the reduction in revenues from the failed payments. Net net, we do not expect the two combined accounting updates to have a material

[15] Breakage applies, if at all, to Positive Wallet Balances and can be analogized to non-refundable gift cards. Under applicable ASCs and guidance, the issuer of a non-refundable gift card can estimate the amount of funds that are unlikely to be used by the customer in the future and can recognize such amount as so-called breakage revenue.

impact on our go-forward revenue base as one essentially offsets the other."

50. Significantly, however, EY knew at the time that Positive Wallet Balances had to be non-refundable in order for Bird to recognize such funds as so-called breakage revenue. EY Coordinating Partner Auger advised Bird's CFO as follows: "In terms of breakage, the one thing that we all need to get on the same page is the Company's policy for refunding wallets … It's critical to get to the bottom of this as ***a policy of allowing customers to refund their wallets would preclude you from breakage***."

51. Bird's CFO advised Auger that Bird had a "history of refunding deposits when asked … We have a history of returning deposits when requested, ***so they are not non refundable***…."

52. Similarly, Bird's internal emails stated that the default legal position is that "***Bird riders are entitled to have any wallet amounts refunded***" ***and changes to Bird's Terms of Service could only be applied <u>prospectively</u> to new funds deposited into customers' virtual wallets***.

53. Despite this obvious roadblock to Bird's ability to recognize breakage from refundable Positive Wallet Balances as revenue, EY referred Bird to the law firm of Alston & Bird to obtain an opinion letter on the issue.

54. Meanwhile, Bird had already set the wheels in motion to keep refundable Positive Wallet Balances for itself by forming a special purpose entity named Bird Treasury Services, LLC (the "**SPE**") in Florida on August 15, 2022 (three months before the Company filed the Disclosure concerning its improper revenue recognition practices from 2020 through 2Q 2022).

55. At that time, Bird's plan and scheme was to (1) shelter the refundable Positive Wallet Balances from the State of Delaware's escheatment/unclaimed property laws by "transferring" such funds to the Special Purpose Entity; (2) move the Wallet Liabilities from Bird's

balance sheet to the Special Purpose Entity's balance sheet in order to artificially improve the former; (3) amend the rider Terms of Service to make Positive Wallet Balances *non-refundable* after 60 days from the deposit thereof; (4) recognize $30 million in breakage revenue from the Positive Wallet Balances that were aged for 630 days[16] (e.g., retroactively); (5) paper the $30 million in breakage revenue as an intercompany loan from the Special Purpose Entity to Bird; and (6) allow Bird to benefit from the $30 million in breakage revenue and eliminate intercompany transactions with the Special Purpose Entity through the filing of consolidated tax returns.

56. When Alston & Bird finally issued its Opinion Letter to Bird on March 7, 2023, it was backdated to October 1, 2022[17] and stated as follows:

> Delaware [Bird's state of incorporation] could argue that (1) ***prior to September 30, 2022, the U.S. Wallet Balances were fully refundable*** based on Bird Rides' representations on its website permitting cash refunds upon request; and (2) ***the non-refundability provision in the [SPE's] Wallet T&Cs is unenforceable with respect to customers who did not consent to the new Wallet T&Cs*** (either expressly or impliedly, by continuing to use the website/app/service after September 30, 2022)…. . A customer that ceases using his or her Wallet before the implementation of the Wallet T&Cs and does not otherwise manifest consent to the Wallet T&Cs is likely not subject to those terms. Accordingly, for these customers, the [SPE's] Wallet T&Cs will likely be unenforceable, in which case ***the pre-September 30, 2022 U.S. Wallet Balances would be refundable***….
>
> Overall, ***Delaware has reasonable arguments that Bird Treasury and Bird Rides are alter egos***, based primarily on the facts that (1) Bird Rides employs all the individuals who perform services for Bird Treasury other than a Treasury Consultant; (2) Bird Treasury's managers are officers of Bird Rides or have other roles at Bird Rides; and (3) Bird Treasury's operations are inextricably intertwined with those of Bird Rides and it is not possible (at least in their current form) for the companies to operate independently from each other.

---

[16] In an email exchange between January 31-February 1, 2023, Wright stated as follows: "The policy [to record breakage revenue is] still being finalized with EY and will probably be a moving target over time. For now, we are proposing we record 100% revenue for any wallets aged over 630 days. 'Aged' means no rides or $$ loads during that time. If I had $20 aged for 630 days, we would record $20 of revenue and reduce deferred revenue by that amount."

[17] The backdating of the Alston & Bird opinion letter from March 7, 2023 to October 1, 2022 is evidenced by emails exchanged in March 2023 and by the opinion letter itself. In the letter, Alston & Bird references the Restatement and its impact on Wallet Liabilities. As noted above, however, the Restatement was filed with the SEC on November 18, 2022, or 48 days *after* the date of the opinion letter.

> Delaware may argue that Bird Rides and Bird Treasury '***concocted a scheme to transfer unclaimed money to a sham, non-Delaware company in order to keep it for themselves***.'
>
> ***[C]ertain facts may support application of the sham transaction doctrine*** including that (1) Bird Rides employs all the individuals who perform services for Bird Treasury (other than the Treasury Consultant); (2) amounts preloaded to U.S. Wallet Balances and redeemed from U.S. Wallet Balances are not transferred in and out of Bird Treasury's bank account, but are handled instead through intercompany accounting entries; and (3) there appear to be no functional changes to the manner in which Bird conducts its business relating to micromobility services and the U.S. Wallet Program.

57. Remarkably, EY supported Bird's recognition of $30 million in Positive Wallet Balances as revenue in Q4 2022 through this SPE scheme despite its knowledge that: (i) Bird could not recognize Positive Wallet Balances as breakage revenue because (a) such balances were refundable; (b) changes to the rider Terms and Conditions could only be applied prospectively and not retroactively to balances that were aged for 630 days; (c) Bird and the SPE were likely alter egos or the SPE was a sham corporation; and (ii) Alston & Bird's Opinion Letter was backdated to accelerate the timing of this improper revenue recognition event.

58. In a memorandum entitled "Accounting for breakage revenue" dated February 15, 2023, EY stated that "[w]e concur with the Company's analysis and conclusion ***based on our analysis* of ASC 842, *Leases* and ASC 606, *Revenue from contracts with customers***. The Company has provided sufficient justification regarding the accounting treatment for the unredeemed preloaded wallet balances."

59. On or about March 31, 2023, Bird terminated EY as its independent auditor.

60. On January 19, 2024, Bird Rides filed bankruptcy schedules reflecting the Wallet Liabilities previously owed to customers as a general unsecured liability owed to the SPE in the

amount of $75,885,988.50 as of the Petition Date.[18]

**IV. Bird's Transfers to, and lack of reasonably equivalent value in exchange from, the Defendants.**

61. As reflected in the spreadsheet attached hereto as *Exhibit A*, Bird transferred $3,717,450 to EY US during the two year period preceding the Petition Date and $6,892,550 during the four year period preceding the Petition Date for the benefit of EY as payment for services purportedly rendered by EY pursuant to the Engagement (the "**Two Year Transfers**" and "**Four Year Transfers**," respectively, or collectively, the **"Transfers**").

62. Bird failed to receive reasonably equivalent value from the Defendants in exchange for the Transfers because EY failed:

(i) to attain the objective of the audit: namely, correctly "opin[ing] on whether the consolidated financial statements [filed with the SEC from 2020 through 2Q 2022 were] presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles";

(ii) "to obtain reasonable, rather than absolute, assurance that the consolidated financial statements [filed with the SEC from 2020 through 2Q 2022 were] free of material misstatement whether caused by error or fraud" in accordance with the standards of the AICPA and PCOAB, as applicable;

(iii) to properly "consider … for the purpose of planning the audit and determining the nature, timing and extent of [its] audit procedures, the Company's internal control over financial reporting";

(iv) to "communicate other opportunities [it] observe[d] for economies in or improved controls over the Company's operations";

(v) to "obtain[] sufficient knowledge of the Company's business and its internal control as it relates to the preparation of both annual and interim financial information [in order] to: identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence; and select the inquiries and analytical procedures that w[ould] provide [it] with a basis for communicating whether [it was] aware of any material modifications that should [have] be[en] made to the interim financial information for it to conform with U.S.

[18] See Case No. 23-20515-CLC, ECF No. 17 at CM/ECF p. 154.

generally accepted accounting principles"; and

(vi) to request "additional information … from management for purposes of the audit" including the Wallet Subledger.

63. Although EY was hired to provide credibility and confidence that the financial statements filed with the SEC from 2020 through 2Q 2022 accurately depicted Bird's financial condition, the Disclosure and Restatement acknowledged that such financial statements were materially false, misleading, and wholly unreliable.

64. EY's deficient services directly contributed to the concealment of Bird's true financial condition, prolonged Bird's corporate existence while insolvent, caused Bird to incur additional liabilities and professional fees, and accelerated Bird's path to bankruptcy.

## E. CLAIMS AGAINST THE DEFENDANTS

**COUNT I**
**(Constructive Fraud)**
**Avoidance and Recovery of Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**

65. The Trustee repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

66. This is an action by the Trustee to avoid and recover the Two Year Transfers made by the Debtors to EY US for the benefit of EY pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a).

67. The Two Year Transfers constituted transfers of interests of the Debtors in property made to and for the benefit of the Defendants:

a. Within two years prior to the Petition Date;

b. For less than reasonably equivalent value in exchange for such transfers; and

c. At a time when the Debtors were:

(i) insolvent or became insolvent as a result of the

transfers;

(ii) engaged or about to be engaged in a business or transaction for which the remaining property of the Debtors was unreasonably small capital; or

(iii) intended to incur, or believed that they would incur, debts beyond their ability to pay as such debts matured.

68. EY US received the Two Year Transfers, which constituted transfers of interests of the Debtors in property, and which were made by the Debtors to and for the benefit of the Defendants.

69. The Trustee can avoid the Two Year Transfers as property interests of the Debtors that are voidable by a creditor holding an unsecured claim.

70. To the extent the Two Year Transfers occurred within two years prior to the Petition Date, such Two Year Transfers were transfers of interests of the Debtors in property whereby the Debtors received less than a reasonably equivalent value in exchange for such transfers, and the Debtors (i) were insolvent on the date that such transfers were made, or became insolvent as a result of such transfers; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was unreasonably small capital; and (iii) intended to incur, or believed that the Debtors would incur, debts that would be beyond their ability to pay as such debts matured.

71. Pursuant to Bankruptcy Code section 550(a), to the extent that all or part of the Two Year Transfers are avoided under Bankruptcy Code section 548(a)(1)(B), the Trustee is entitled to recover the Two Year Transfers or the value of such property from the Defendants for whose benefit such transfers were made, or as immediate or mediate transferees of an initial transferee of such transfers.

**WHEREFORE**, the Trustee respectfully requests that this Court enter a judgment against the Defendants:

(a) determining all or part of the Two Year Transfers were fraudulent and avoiding such transfers for the benefit of the Debtors' estates under Bankruptcy Code sections 548(a)(1)(B) and 550(a);

(b) ordering a monetary award in the amount of the avoided Two Year Transfers together with accrued prejudgment interest, costs and reasonable attorneys' fees (if applicable), pursuant to Bankruptcy Code section 550;

(c) awarding any additional relief this Court deems is just and proper.

**COUNT II**
**(Constructive Fraud)**
**Avoidance and Recovery of Four Year Transfers Under 11 U.S.C. §§ 544(b) and 550**
**& Florida Statute § 726.106(1), and/or Otherwise Applicable Law**

72. The Trustee repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

73. This is an action to recover fraudulent transfers pursuant to Bankruptcy Code sections 544(b) and 550, and Florida Statute sections 726.106(1) and 726.108.

74. The Four Year Transfers constituted transfer of interests of the Debtors in property made to and for the benefit of the Defendants:

a. Within four years prior to the Petition Date;

b. For less than reasonably equivalent value in exchange for such transfers; and

c. At a time when the Debtors were insolvent or became insolvent as a result of the transfers.

75. There is at least one actual holder of an allowed unsecured claim pursuant to Bankruptcy Code section 502, who would have standing to assert a claim for relief under Chapter

726 of the Florida Statutes, the Florida Uniform Fraudulent Transfer Act ("**FUFTA**").

76. The Four Year Transfers to the Defendants are avoidable under Florida Statute section 726.108(a) and Bankruptcy Code section 544(b). Pursuant to Bankruptcy Code section 550(a), the recovery of property for the benefit of the Debtors' estates is authorized to the extent the transfers are avoided under Bankruptcy Code section 544(b) and FUFTA.

**WHEREFORE**, the Trustee respectfully requests the Court to enter a judgment against the Defendants:

(a) determining the Four Year Transfers were fraudulent and avoiding such transfers for the benefit of the Debtors' estates under Bankruptcy Code section 544(b) and Florida Statute section 726.106(1), and/or otherwise applicable law;

(b) ordering a monetary award in the amount of the avoided Four Year Transfers together with accrued prejudgment interest, costs and reasonable attorneys' fees (if applicable), pursuant to Bankruptcy Code section 550; and

(c) awarding any additional relief this Court deems is just and proper.

**COUNT III**
**(Constructive Fraud)**
**Avoidance and Recovery of Four Year Transfers Under 11 U.S.C. §§ 544 and 550**
**& Florida Statute § 726.105(1)(b), and/or Otherwise Applicable Law**

77. The Trustee repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

78. This is an action to recover the Four Year Transfers pursuant to Bankruptcy Code sections 544(b) and 550, and Florida Statute sections 726.105(1)(b) and 726.108.

79. The Four Year Transfers constituted transfers of interests of the Debtors in property made to and for the benefit of the Defendants:

a. Within four years prior to the Petition Date;

b. For less than reasonably equivalent value in exchange for such transfers; and

c. At a time when the Debtors were either

(i) engaged or about to engage in a business or transaction for which the remaining assets of the Debtors was unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

80. There is at least one actual holder of an allowed unsecured claim pursuant to Bankruptcy Code section 502, who would have standing to assert a claim for relief under FUFTA.

81. By reason of the foregoing, the Four Year Transfers to and for the benefit of the Defendants are avoidable pursuant to Bankruptcy Code section 544, Florida Statute § 726.105(1)(b), and/or otherwise applicable law. As a result, the Trustee may recover the amount or value of the Four Year Transfers from the Defendants pursuant to 11 U.S.C. § 550.

**WHEREFORE**, the Trustee respectfully requests the Court to enter a judgment against the Defendants:

(a) determining the Four Year Transfers were fraudulent and avoiding such transfers for the benefit of the Debtors' estates under Bankruptcy Code section 544(b), Florida Statute § 726.105(1)(b), and/or otherwise applicable law;

(b) ordering a monetary award in the amount of the Four Year Transfers together with accrued prejudgment interest, costs and reasonable attorneys' fees (if applicable), pursuant to Bankruptcy Code section 550; and

(c) awarding any additional relief this Court deems is just and proper.

**COUNT IV[19]**
**(Constructive Fraud)**
**Avoidance and Recovery of Four Year Transfers Under 11 U.S.C. §§ 544 and 550**
**& New York Debtor and Creditor Law § 273(a)(2) and/or Otherwise Applicable Law**

82. The Trustee repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

83. This is an action to recover fraudulent transfers pursuant to Bankruptcy Code sections 544(b) and 550, and New York Debtor and Creditor Law § 273(a)(2).

84. The Four Year Transfers constituted transfer of interests of the Debtors in property made to and for the benefit of the Defendants:

a. Within four years prior to the Petition Date;

b. For less than reasonably equivalent value in exchange for such transfers; and

c. At a time when the Debtors were insolvent or became insolvent as a result of the transfers.

85. There is at least one actual holder of an allowed unsecured claim pursuant to Bankruptcy Code section 502, who would have standing to assert a claim for relief under the provisions of the New York Debtor and Creditor Law (Uniform Voidable Transactions Act).

86. The Four Year Transfers to and for the benefit of the Defendants are avoidable under New York Debtor and Creditor Law § 273(a)(2) and Bankruptcy Code section 544(b). Pursuant to Bankruptcy Code section 550(a), the recovery of property for the benefit of the Debtors' estates is authorized to the extent the transfers are avoided under Bankruptcy Code section 544(b) and the New York Debtor and Creditor Law (Uniform Voidable Transactions Act).

[19] Counts 4 and 5 are plead in the alternative under the New York Debtor and Creditor Law (Uniform Voidable Transactions Act).

**WHEREFORE**, the Trustee respectfully requests the Court to enter a judgment against the Defendants:

(a) determining the Four Year Transfers were fraudulent and avoiding such transfers for the benefit of the Debtors' estates under Bankruptcy Code section 544(b) and New York Debtor and Creditor Law § 273(a)(2), and/or otherwise applicable law;

(b) ordering a monetary award in the amount of the avoided Four Year Transfers together with accrued prejudgment interest, costs and reasonable attorneys' fees (if applicable), pursuant to Bankruptcy Code section 550; and

(c) awarding any additional relief this Court deems is just and proper.

**COUNT V**
**(Constructive Fraud)**
**Avoidance and Recovery of Four Year Transfers Under 11 U.S.C. §§ 544 and 550**
**& New York Debtor and Creditor Law § 274(a) and/or Otherwise Applicable Law**

87. The Trustee repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

88. This is an action to recover the Four Year Transfers pursuant to Bankruptcy Code sections 544(b) and 550, and New York Debtor and Creditor Law § 274(a).

89. The Four Year Transfers constituted transfers of interests of the Debtors in property made to and for the benefit of the Defendants:

a. Within four years prior to the Petition Date;

b. For less than reasonably equivalent value in exchange for such transfers; and

c. At a time when the Debtors were either

(i) engaged or about to engage in a business or transaction for which the remaining assets of the Debtors was unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

90. There is at least one actual holder of an allowed unsecured claim pursuant to Bankruptcy Code section 502, who would have standing to assert a claim for relief under the New York Debtor and Creditor Law (Uniform Voidable Transactions Act).

91. By reason of the foregoing, the Four Year Transfers to and for the benefit of the Defendants are avoidable pursuant to Bankruptcy Code section 544, New York Debtor and Creditor Law § 274(a), and/or otherwise applicable law. As a result, the Trustee may recover the amount or value of the Four Year Transfers from the Defendants pursuant to 11 U.S.C. § 550.

**WHEREFORE**, the Trustee respectfully requests the Court to enter a judgment against the Defendants:

(a) determining the Four Year Transfers were fraudulent and avoiding such transfers for the benefit of the Debtors' estates under Bankruptcy Code section 544(b), New York Debtor and Creditor Law § 274(a), and/or otherwise applicable law;

(b) ordering a monetary award in the amount of the Four Year Transfers together with accrued prejudgment interest, costs and reasonable attorneys' fees (if applicable), pursuant to Bankruptcy Code section 550; and

(c) awarding any additional relief this Court deems is just and proper.

## F. RESERVATION OF RIGHTS

92. The Trustee reserves his right to amend this Complaint, upon completion of his investigation and discovery, to assert any additional claims for relief against the Defendants as may be warranted under the circumstances allowed by law.

Respectfully submitted this 17th day of July, 2026.

**FOX ROTHSCHILD LLP**

By: /s/ Robert F. Elgidely
Robert F. Elgidely, Esq.
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2750
Miami, FL 33131
Telephone: (305) 442-6543
Facsimile: (305) 442-6541
Email: relgidely@foxrothschild.com

-and-

Sidney S. Liebesman, Esq. (admitted *pro hac vice*)
Stephanie Slater Ward, Esq. (admitted *pro hac vice*)
1201 N. Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 622-4237
Facsimile: (302) 656-8920
Email: sliebesman@foxrothschild.com
sward@foxrothschild.com

-and-

Elizabeth C. Viele, Esq. (*pro hac vice* forthcoming)
101 Park Avenue, 17th Floor
New York, NY 10178
Telephone: (212) 878-7968
Facsimile: (212) 692-0940
Email: eviele@foxrothschild.com

-and-

Gordon E. Gouveia, Esq. (admitted *pro hac vice*)
321 North Clark Street, Suite 1600
Chicago, IL 60654
Telephone: (312) 980-3816
Facsimile: (312) 517-9201
Email: ggouveia@foxrothschild.com

-and-

Michael A. Sweet, Esq. (admitted *pro hac vice*)
345 California Street, Suite 2200
San Francisco, California 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436
Email: msweet@foxrothschild.com

*Counsel to Joseph J. Luzinski, not individually but solely in his capacity as the Liquidating Trustee of the Bird Global Liquidating Trust*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 17, 2026, I electronically filed the foregoing *Amended Adversary Complaint To Avoid And Recover Constructive Fraudulent Transfers* with the Clerk of the Court using the CM/ECF System. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means including Ian M. Ross, Esq., Sidley Austin LLP, 830 Brickell Plaza, Miami, FL 33131.

By: /s/ Robert F. Elgidely
Robert F. Elgidely, Esq.

**Bird Rides OpCo. - USD**
**Vendor: 13254 Ernst & Young US LLP**
**Source: NetSuite**

| Internal ID | * | Date | Type | Document Number | Name | Account | Memo | Amount |
|---|---|---|---|---|---|---|---|---|
| 952001 | * | 10/2/2020 | Bill Payment | 00000865/6 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00000865/6 | (25,000.00) |
| 1304680 | * | 11/25/2020 | Bill Payment | 00000939/2 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00000939/2 | (100,000.00) |
| 1736228 | * | 2/17/2021 | Bill Payment | 00001063/9 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001063/9 | (55,000.00) |
| 1751911 | * | 2/24/2021 | Bill Payment | 00001072/1 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001072/1 | (100,000.00) |
| 1834423 | * | 3/11/2021 | Bill Payment | 00001097/2 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001097/2 | (165,000.00) |
| 2038462 | * | 4/26/2021 | Bill Payment | 00001160/4 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001160/4 | (225,000.00) |
| 2147666 | * | 5/20/2021 | Bill Payment | 00001183/5 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001183/5 | (75,000.00) |
| 2165302 | * | 5/26/2021 | Bill Payment | 00001188/4 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001188/4 | (430,000.00) |
| 2194418 | * | 6/3/2021 | Bill Payment | 00001193/3 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001193/3 | (500,000.00) |
| 2424329 | * | 7/28/2021 | Bill Payment | 00001249/7 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001249/7 | (605,000.00) |
| 2603330 | * | 9/10/2021 | Bill Payment | 00001292/16 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001292/16 | (71,000.00) |
| 2654003 | * | 9/22/2021 | Bill Payment | 00001302/9 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001302/9 | (170,000.00) |
| 2711615 | * | 10/6/2021 | Bill Payment | 00001316/12 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001316/12 | (15,000.00) |
| 2823706 | * | 11/5/2021 | Bill Payment | 00001339/27 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001339/27 | (20,000.00) |
| 2881823 | * | 11/22/2021 | Bill Payment | 00001350/116 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001350/116 | (150,000.00) |
| 2929680 | * | 12/3/2021 | Bill Payment | 00001358/28 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001358/28 | (119,100.00) |
| 2944404 | * | 12/8/2021 | Bill Payment | 00001359/19 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001359/19 | (350,000.00) |
| 3002212 | * | 12/22/2021 | Bill Payment | 00001379/11 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001379/11 | (200,000.00) |
| 3109635 | * | 1/26/2022 | Bill Payment | 00001413/23 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001413/23 | (200,000.00) |
| 3182880 | * | 2/16/2022 | Bill Payment | 00001435/17 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001435/17 | (250,000.00) |
| 3288394 | * | 3/16/2022 | Bill Payment | 00001470/31 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001470/31 | (150,000.00) |
| 3713159 | * | 6/28/2022 | Bill Payment | 00001574/1 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001574/1 | (150,000.00) |
| 3713160 | * | 6/28/2022 | Bill Payment | 00001574/2 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001574/2 | (242,500.00) |
| 4158404 | * | 10/19/2022 | Bill Payment | 00001649/22-A | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | FY22 Consolidated Audit & Quarterly Review | (300,000.00) |
| 4159015 | * | 10/19/2022 | Bill Payment | 00001649/22-B | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | fixing line applied to on PO | (26,000.00) |
| 4168060 | * | 10/20/2022 | Bill Payment | 00001707/4 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001707/4 | (200,000.00) |
| 4322839 | * | 12/31/2022 | Bill Payment | 00001761/55 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001761/55 | (200,000.00) |
| 4366135 | * | 1/18/2023 | Bill Payment | 00001770/1 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001770/1 | (395,000.00) |
| 4422047 | * | 2/10/2023 | Bill Payment | 00001793/28 | 13254 Ernst & Young US LLP | 10107 Cash & Cash Equivalents : Bank : SVB - OpCo - AP #1958 | 00001793/28 | (375,000.00) |
| 4497569 | * | 3/14/2023 | Bill Payment | EY wire pd 3-14-23 | 13254 Ernst & Young US LLP | 10111 Cash & Cash Equivalents : Bank : Citibank - OpCo - Checking #9115 | EY wire pd 3-14-23 | (400,000.00) |
| 4531467 | * | 3/28/2023 | Bill Payment | EY US01U001159838 wire pd 3-28-23 | 13254 Ernst & Young US LLP | 10111 Cash & Cash Equivalents : Bank : Citibank - OpCo - Checking #9115 | EY US01U001159838 wire pd 3-28-23 | (170,000.00) |
| | | | | | | | | **(6,433,600.00)** |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4614188 | * | 4/19/2023 | Bill Payment | EY US01U001190089 wire pd 4-19-23 | 13254 Ernst & Young US LLP | 10111 Cash & Cash Equivalents : Bank : Citibank - OpCo - Checking #9115 | EY US01U001190089 wire pd 4-19-23 | (226,450.00) |
| 4841493 | * | 6/29/2023 | Bill Payment | EY Paid via Wire 06-29-23 | 13254 Ernst & Young US LLP | 10111 Cash & Cash Equivalents : Bank : Citibank - OpCo - Checking #9115 | | (32,500.00) |
| 4879392 | * | 7/11/2023 | Bill Payment | Wire EY 710 | 13254 Ernst & Young US LLP | 10111 Cash & Cash Equivalents : Bank : Citibank - OpCo - Checking #9115 | Issuance of a comfort letter | (125,000.00) |
| 5052532 | * | 8/16/2023 | Bill Payment | Wire EY 816 9115 | 13254 Ernst & Young US LLP | 10111 Cash & Cash Equivalents : Bank : Citibank - OpCo - Checking #9115 | comfort letter for Quarter Two 2022 | (75,000.00) |
| | | | | | | | | **(458,950.00)** |

**6,892,550.00**

# EXHIBIT A